ACCEPTED
12-14-00357-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
3/31/2015 4:10:12 PM
CATHY LUSK
CLERK

No. 12-14-00357-CV

# In The Court of Appeals
# For the Twelfth District of Texas
# Tyler, Texas

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
3/31/2015 4:10:12 PM
CATHY S. LUSK
Clerk

PINECREST SNF, LLC D/B/A PINECREST
NURSING & REHABILITATION CENTER,
*Appellant,*

v.

TASCO BAILEY, NATHAN BAILEY, CURLIE BAILEY, ROY BAILEY,
BILL BAILEY, JAMES BAILEY, EARL BAILEY, MARY DUNLAP,
AND LUCILLE MARTIN, AS HEIRS OF ARCHIE BAILEY,
*Appellees.*

On Appeal from the 114th Judicial District Court of Smith County, Texas
The Honorable Christi Kennedy, Presiding Judge
(Trial Cause No. 14-0856-B)

## BRIEF OF APPELLEES

| | |
|---|---|
| Robert M. Wharton | Andrea Zarikian |
| Texas Bar No: 24079562 | Texas Bar No: 24093411 |
| firm@mciverbrown.com | firm@mciverbrown.com |
| **MCIVER BROWN LAW FIRM** | **MCIVER BROWN LAW FIRM** |
| 712 Main Street, Suit 800 | 712 Main Street, Suite 800 |
| Houston, Texas 77002 | Houston, Texas 77002 |
| Telephone: 832-767-1673 | Telephone: 832-767-1673 |
| Facsimile: 832-767-1783 | Facsimile: 832-767-1783 |

*Counsel for Appellees*
**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................i
TABLE OF AUTHORITIES ............................................................... ii
STATEMENT OF THE CASE ..............................................................1
ISSUE PRESENTED ...............................................................................2
STATEMENT OF THE FACTS ..............................................................3
SUMMARY OF THE ARGUMENT...........................................................4
ARGUMENT ........................................................................................5
  I. THE STANDARD OF REVIEW ON THIS APPEAL IS ABUSE OF DISCRETION. ........5
  II. PURSUANT TO APPLICABLE TEXAS CASE LAW AND CHAPTER 74, DR. DAVEY'S AMENDED REPORT CONSTITUTES A GOOD FAITH EFFORT TO COMPLY WITH THE REQUIREMENTS OF SECTION 74.351 ............................... 8
    A. DR. DAVEY'S AMENDED EXPERT REPORT ADEQUATELY EXPLAINS THE CAUSAL RELATIONSHIP BETWEEN APPELLANT'S FAILURES TO MEET THE STANDARD OF CARE AND MS. BAILEY'S INJURIES .............. 11
    B. BECAUSE APPELLEES DID NOT ASSERT A WRONGFUL DEATH CLAIM, DR. DAVEY'S AMENDED EXPERT REPORT DOES NOT REQUIRE EXPLANATION OF HOW APPELLANT'S FAILURES TO MEET THE STANDARD OF CARE CAUSED MS. BAILEY'S DEATH ........................... 19
CONCLUSION AND PRAYER ........................................................... 21
CERTIFICATE OF COMPLIANCE WITH RULE 9.4....................................... 24
CERTIFICATE OF SERVICE................................................................. 25
APPENDIX TO APPELLEES' BRIEF ........................................................ 26

APPENDIX:

| Dr. Davey's Amended Expert Report | Appendix A |
| Dr. Davey's Curriculum Vitae | Appendix B |

CASES

*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*,
46 S.W.3d 873 (Tex. 2001) .......................................................................6, 8, 9, 12

*Arboretum Nursing and Rehab. Ctr. of Winnie, Inc., v. Issacks*,
No. 14-07-00895-CV, 2008 Tex. App. LEXIS 3672 (Tex. App.–Houston
[14th Dist.] May 22, 2008) (memo. op.) ..................................................... 13

*Bakhtari v. Estate of Dumas*,
317 S.W.3d 486 (Tex. App.—Dallas 2010, no pet.) ................................... 11

*Baylor Med. Ctr. at Waxahachie v. Wallace*,
278 S.W.3d 552 (Tex. App.—Dallas 2009, no pet.) ................................... 13

*Certified EMS, Inc. v. Potts*,
392 S.W.3d 625 (Tex. 2013, rehearing denied) ...............................10, 20, 21

*Chaupin v. Schroeder*,
No. 14-06-01102-CV, 2007 Tex. App. LEXIS 5837 (Tex. App.–Houston
[14th Dist.] July 26, 2007, no pet.) (memo. op.) ......................................... 13

*Christus Spohn Health Sys. Corp. v. Castro*,
No. 13-13-00302, 2013 WL 6576041 (Tex. App.—Corpus Christi, Dec.
12, 2013, no pet. h.) ..................................................................................... 13

*Costello v. Christus Santa Rosa Health Care Corp.*,
141 S.W.3d 245 (Tex. App. —San Antonio 2004, no pet.) ........................ 11

*Cruz v. Paso Del Norte Health Found.*,
44 S.W.3d 622 (Tex. App. —El Paso 2001, pet. denied)............................ 12

*Downer v. Aquamarine Operators, Inc.*,
701 S.W.2d 238 (Tex. 1985), *cert denied*, 476 U.S. 1159 (1986)..................7

*Flores v. Fourth Court of Appeals*,
777 S.W.2d 38 (Tex. 1989) .........................................................................6

*Greenberg v. Gillen*,
     257 S.W.3d 281 (Tex. App— Dallas 2008, pet. dism'd) ..............................8

*In re McAllen Med. Ctr., Inc.*,
     275 S.W.3d 458 (Tex. 2008) ........................................................................6

*Jelinek v. Casas*
     328 S.W.3d 526 (Tex. 2010) ..................................................................... 12

*Johnson v. Fourth Court of Appeals*,
     700 S.W.2d 916 (Tex. 1985) .......................................................................6

*Kayani v. Stevens*,
     No. 09-12-00462-CV, 2013 Tex. App. LEXIS 363 (Tex.
     App.—Beaumont 2013, no pet.)................................................................. 13

*Larson v. Downing*,
     197 S.W.3d 303 (Tex. 2006) .......................................................................7

*Lee Lewis Constr. Inc. v. Harrison*,
     70 S.W.3d 778 (Tex. 2001) ....................................................................... 11

*Leland v. Brandal*,
     257 S.W.3d 204 (Tex. 2008) .......................................................................8

*Renaissance Surgical Ctrs.-S. Texas, L.L.P. v. Jimenez*,
     No. 13-07-00121-CV, 2008 Tex. App. LEXIS 6857 (Tex. App.—Corpus
     Christi Aug. 28, 2008, no pet.) ....................................................................6

*Valle v. Taylor*,
     No. 09-11-00223-CV, 2012 Tex. App. LEXIS 110 (Tex. App.—Beaumont
     Jan. 5, 2012, not pet.) ............................................................................... 20

**STATUTES**

TEX. CIV. PRAC. & REM. CODE § 74.351....................................................3, 4, 8, 21

## STATEMENT OF THE CASE

*Nature of the case:*

This is a medical malpractice case governed by Chapter 74 of the Texas Civil Practice and Remedies Code. Tasco Bailey, Nathan Bailey, Curlie Bailey, Roy Bailey, Bill Bailey, James Bailey, Earl Bailey, Mary Dunlap, and Lucille Martin, as heirs of Archie Bailey, Deceased, ("Appellees") filed a medical malpractice claim against Pinecrest SNF LLC d/b/a Pinecrest Nursing & Rehabilitation Center ("Appellant"). Appellees provided Appellant with an expert report authored by Dr. Christopher Davey. The trial court sustained Appellant's objections to the sufficiency of Dr. Davey's expert report. Appellees subsequently served a timely amended expert report authored by Dr. Davey in compliance with the statutory requirements of Chapter 74. The amended expert report authored by Dr. Davey was sufficient because it thoroughly explained the causal connection that adequately links Ms. Bailey's injuries to Appellant's breaches in the standard of care. On November 25, 2014, the trial court entered an order overruling Appellant's objections to Dr. Davey's amended report and denying Appellant's Motion to Dismiss. This interlocutory appeal followed.

*Trial court information:*

Hon. Christi Kennedy, Judge Presiding, 114th Judicial District Court, Smith County, Texas.

*Trial court disposition:*

Judge Kennedy overruled Appellant's objections to Dr. Davey's amended report and denied Appellant's Motion to Dismiss..

## ISSUE PRESENTED

1.    As it pertains to the statutory element of causation for which a medical expert must provide a fair summary of his opinion on pursuant to Chapter 74, the expert must explain in his report the basis for his statements by linking conclusions to facts and need not rule out all potential causes. In his amended report, Dr. Davey more than meets this threshold standard to sufficiently notify Defendant Pinecrest Nursing of at least one causation theory by providing a basis for his opinion that adequately links Ms. Bailey's injuries to at least one of Defendant Pinecrest Nursing's breaches of the standard of care. Did the Honorable Christi Kennedy properly exercise her discretion by ruling that Dr. Davey's amended expert report complied with the statutory requirements set forth in Chapter 74?

## STATEMENT OF THE FACTS

This medical malpractice case was filed after Ms. Archie Bailey, deceased, was so neglected while she was a patient at Appellant's facility that she developed a severe and infected Stage IV sacral decubitus ulcer. As a result of the substandard care their mother received, Appellees sought redress through filing this suit. Pursuant to TEX. CIV. PRAC. & REM. CODE § 74.351, Appellees served Appellant with the expert report and curriculum vitae ("CV") of Christopher Davey, M.D., a board-certified Wound Specialist physician. (C.R.: 54 to 74). After the trial court sustained Appellant's objections to Dr. Davey's initial report, Appellees subsequently served Appellant with an Amended Expert Report from Dr. Davey. (C.R.: 139 to 165). Appellant again objected. (CR.: 166-192). In order to obtain a ruling on Appellant's objections to Dr. Davey's Amended Expert Report, Appellees filed a motion to overrule Appellant's objections, and set their motion for hearing. Following this hearing, the Honorable Christi Kennedy, Presiding Judge of the 114th Judicial District of Smith County, overruled Appellant's objections by Order entered on November 25, 2014 (CR.: 243). Appellant has now taken this subsequent interlocutory appeal. For the same reasons iterated at the trial court below, Appellees request that this Court affirm the trial court's November 25, 2014 Order overruling Appellant's objections to Dr. Davey's amended expert report and denying Appellant's Motion to Dismiss.

## SUMMARY OF THE ARGUMENT

Appellant's brief requests dismissal of this suit and incorrectly argues that Appellees have failed to comply with the expert report requirements of TEX CIV. PRAC. & REM. CODE § 74.351. The trial court's ruling should stand for the following reasons.

Appellants contend that the trial court committed an abuse of discretion by overruling its Chapter 74 objections and denying its Motion to Dismiss. Quite simply, Appellant's argument is not borne out by the record. Judge Kennedy did not abuse her discretion in determining that Dr. Davey's amended report complies with the statutory report requirements of Chapter 74 because it represents a good faith effort to provide a fair summary of Dr. Davey's opinions concerning the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between the failure and the sustained injuries. In fact, contrary to Appellant's colorable claims, Dr. Davey's amended report specifically identifies Appellant's conduct that is being questioned and explicitly explains how that conduct caused Ms. Bailey's injuries. Within his report, Dr. Davey clearly establishes what standard of care is required, sets forth in detail how Appellant breached the standard of care, and thoroughly explains how and why those breaches of the standard of care caused the harm suffered by Ms. Bailey. Moreover, Appellant's assertions of conjecture are profoundly misplaced, as Dr.

4

Davey appropriately expresses in terms of medical probability, and not mere conjecture, how pressure ulcers form and how a lack of proper treatment can lead to the development and worsening of pressure ulcers. Lastly, Appellant mischaracterizes the claims asserted by Appellees, alleging that Dr. Davey is required to opine on how Appellant's breaches of the standard of care caused Ms. Bailey's death despite Appellees having only asserted survival claims. Dr. Davey's amended report undeniably provides the information required under Chapter 74 by informing Appellant of the specific conduct Appellees have called into question and sufficiently linking that conduct and the injuries to provide a sufficient basis for the trial court to conclude that Appellees' survival claims have merit. Therefore, the trial court did not abuse its discretion when it concluded that Dr. Davey's amended report adequately constituted an objective, good faith effort to comply with the statutory requirements of Chapter 74. Appellant's arguments to the contrary are unfounded.

Accordingly, for the reasons set forth above, Appellant's appeal should be denied, and this meritorious case should be allowed to proceed.

## ARGUMENT

### I.    The Standard of Review on This Appeal is Abuse of Discretion.

Judge Kennedy's decision that Dr. Davey's amended report is adequate is reviewed under a purely clear abuse of discretion standard. *Am. Transitional Care*

*Ctrs. of Tex, Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); (holding a trial court's decision regarding the adequacy of an expert report and denial of a defendant's motion to dismiss is reviewed under the abuse of discretion standard); *see In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008). As the Supreme Court stated, "a party who attacks the ruling of a trial court that is reviewed under the abuse of discretion standard labors under a heavy burden." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding). In that case, the Texas Supreme Court stated the standard of review as follows:

> In order to find an abuse of discretion, the reviewing court must conclude that the facts and circumstances of the case extinguish any discretion in the matter and that the law permits but one decision.

*Id.* at 918. What is more, "[a] reviewing court may not substitute its judgment for that of the trial court," when reviewing a discretionary matter. *Renaissance Surgical Ctrs.-S. Tex., L.L.P. v. Jimenez*, No. 13-07-00121-CV, 2008 Tex. App. LEXIS 6857, at *10 (Tex. App.—Corpus Christi Aug. 28, 2008, no pet.) (mem. op.); *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41-42 (Tex. 1989) (orig. proceeding). To further clarify and define the heavy burden that both an appellant and an appellate court must shoulder when reviewing a discretionary order by a district court, the Texas Supreme Court stated:

> The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial

6

court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and principles. Another way of stating the test is whether the act is arbitrary and unreasonable.

*Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985), *cert denied*, 476 U.S. 1159 (1986).

Indeed, the Supreme Court has reversed appellate decisions where the appellate courts found that the trial judge had abused his discretion, and reinstated the trial court's original ruling on the expert reports, noting that "[w]e do not disturb the trial court's discretion absent a clear abuse," and that any "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304-305 (Tex. 2006).

Therefore, it is under this most strict and deferential standard of review that the issues raised by the Appellant are reviewed. Judge Kennedy's order should be reversed only if she failed to apply any guiding rules and principles in denying the Appellant's Motion to Dismiss. As will be shown, there is absolutely nothing in the record of this case that constitutes any evidence, or any indication whatsoever, that in denying the Appellant's objections, Judge Kennedy made her ruling "without reference to any guiding rules and principles." In fact if anything, Judge Kennedy's decision is entirely consistent with the principles and standards pronounced by the Texas Supreme Court.

**II. Pursuant to Applicable Texas Case Law and Chapter 74, Dr. Davey's Amended Expert Report Constitutes a Good Faith Effort to Comply with the Requirements of Section 74.351.**

The purpose of the report requirement is not to preclude meritorious claims but to weed out frivolous claims. *Leland v. Brandal,* 257 S.W.3d 204, 208 (Tex. 2008) (Brister, J., dissenting). In that regard, a plaintiff must serve an expert report that provides a fair summary of the expert's opinion as to each of the statutory elements of: (1) standard of care; (2) breach; and (3) causation. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Greenberg v. Gillen,* 257 S.W.3d 281, 282 (Tex. App—Dallas 2008, pet. dism'd). When considering the sufficiency of a Chapter 74 expert report, the Supreme Court has established this singular standard:

> The issue for the trial court is whether 'the reports' represent a good faith effort to comply with the statutory definition of an expert report.
> ***
> [T]he report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the court to conclude the claims have merit.

*Palacios*, 46 S.W.3d at 878-89. An expert report need not meet the same evidentiary standards that an expert witness would later need to satisfy in offering evidence in a summary-judgment proceeding or during a trial on the merits. To quote from the *Palacios* Court:

> However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the

8

same requirements as the evidence offered in a summary-judgment proceeding or at trial.

*Id.*

Dr. Davey's amended report easily satisfies the requirements of section 74.351. Confusingly, Appellant contends difficulty in identifying both the applicable standards and the breaches of those standards within Dr. Davey's amended report. Contrary to Appellant's gravely misfounded contentions, the amended report articulates with straightforward precision a fair summary of both the applicable standards of care and the conduct of Appellant that is being called into question. (CR 148-155; Appendix A, p. 5-12). In adequately discussing the standard of care applicable to Appellant, Dr. Davey specifically identifies that the "standard of care mandates that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores" and "that a resident who has pressure sores must receive the necessary treatment and services to promote healing and prevent infection." (CR 151; Appendix A, p. 8). Dr. Davey provides further explanation on the applicable standards of care wherein he exhaustively identifies, with sufficient particularity, what specific interventions exist to prevent and treat pressure ulcers, including turning and repositioning a patient, providing pressure-relieving devices, keeping patients clean and dry, and keeping the patient properly nourished. (CR 148, 150; Appendix A, p. 5, 7). By identifying in his amended report the specific interventions that exist to prevent

9

and treat pressure ulcers, Dr. Davey provides a fair summary that explains with sufficient clarity the standards of care applicable to Appellant.

Dr. Davey also sufficiently identifies in his amended report the specific failures by Appellant, and how Ms. Bailey was affected. Specifically within his amended report, Dr. Davey sets forth Appellant's breaches in the standard of care that caused Ms. Bailey's injuries wherein he explicitly enunciates Appellant's failures. (CR 151-155; Appendix A, p. 8-12). Without question, Dr. Davey expressly states Appellant's breaches in the standard of care to include: (1) failing to prevent the development of pressure ulcers, (2) failing to properly treat the patient's pressure ulcers one they developed, and (3) allowing the patient's ulcer to worsen and become infected. (CR 151-155; Appendix A, p. 8-12). If at least one of these liability theories is adequately addressed and sufficiently linked to the development or worsening of pressure ulcers, Plaintiffs' suit must be allowed to proceed. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013). Contrary to Defendant's misguided understanding, which will be explained in greater detail below, Dr. Davey's detailed and specific amended report exceeds the *Palacios* good faith threshold standard by identifying the conduct that is being called into question and thoroughly explaining how that conduct is connected as the cause of Ms. Bailey's injuries to provide the Court with a basis to conclude Appellees' claims have merit.

**A. Dr. Davey's Amended Expert Report Adequately Explains the Causal Relationship Between Appellant's Failures to Meet the Standard of Care and Ms. Bailey's Injuries.**

The only issue in this Appeal is the adequacy of the causation analysis within Dr. Davey's amended expert report. Appellant incorrectly asserts that Dr. Davey's amended report is conclusory with respect to causation. In fact, Appellant's misplaced arguments are squarely refutable. Contrary to Appellant's understanding, the amended report is more than sufficient because it thoroughly explains the causal connection that adequately links Ms. Bailey's injuries to Appellant's breaches in the standard of care.

To satisfy the required element of causation under Chapter 74, an expert report must include a fair summary of the expert's opinion regarding the causal relationship between the breach of the standard of care and the injury, harm, or damages claimed. *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.). A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent said act or omission the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App. —San Antonio 2004, no pet.). More than one act may be the proximate cause of the same injury. *Lee Lewis Constr. Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). A plaintiff need not establish causation in terms of medical certainty, nor is she

11

required to exclude every other reasonable hypothesis; reasonable inferences may be drawn from the evidence. *Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 630 (Tex. App. —El Paso 2001, pet. denied). When the Plaintiff alleges a breach with regard to the method of treatment, the reports cannot merely state the expert's conclusions but rather must explain the basis of the expert's statements to link his or her conclusions to the facts. *Palacios*, 46 S.W.3d at 879. An expert must explain the basis of his statements and link his conclusions to the facts in order for his opinions not to be conclusory. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

Dr. Davey's causation opinion, which is four pages in length, is sufficiently detailed. Within the causation section, Dr. Davey's amended report goes into a pathophysiological explanation for how pressure ulcers develop and how the standards of care he previously articulated are designed to prevent ulcers from occurring or worsening. (CR 155-158; Appendix A, p. 12-15). Within his causation opinion, Dr. Davey describes precisely how Appellant's breaches more likely than not, within a reasonable degree of medical probability, caused Mr. Bailey's injuries. (CR 155-158; Appendix A, p. 12-15). As will be discussed in greater detail below, this causation section is far from conclusory.

Appellant argues that Dr. Davey's amended report must address Ms. Bailey's development of a pressure ulcer in the context of her underlying

conditions. However, Defendant's claim that an expert must rule out all other potential causes of an alleged injury is wholly unsupported. The fact that the expert report does not address hypothetical situations does not necessarily render it conclusory on causation. *VHS San Antonio Partners LLC v. Garcia*, No. 04-09-00297-CV, 2009 Tex. App. LEXIS 7790, at \*15 (Tex. App.—San Antonio 2009, pet. denied) (mem. op.). Although the law requires the expert report to link the expert's conclusion on causation with the alleged breach of the standard of care, nothing in Chapter 74 requires the expert report to address or rule out all other possible scenarios. *Id.* In fact, binding precedent has held that a Chapter 74 expert report need not rule out all potential causes.[1]

In support of its argument, Appellant cites *Christus Spohn Health Sys. Corp. v. Castro*. According to Appellant, this case holds an expert report was conclusory where it failed to address the patient's underlying health issues and their effects on the development of pressure ulcers. *Christus Spohn Health Sys. Corp. v. Castro,* No. 13-13-00302, 2013 WL 6576041 (Tex. App.—Corpus Christi, Dec. 12, 2013,

---

[1] *VHS San Antonio Partners LLC v. Garcia*, No. 04-09-00297-CV, 2009 Tex. App. LEXIS 7790, at \*15 [\*9] (Tex. App.—San Antonio 2009, pet. denied) (mem. op.); *see also Kayani v. Stevens*, No. 09-12-00462-CV, 2013 Tex. App. LEXIS 363 (Tex. App.—Beaumont 2013, no pet.); *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.); *Arboretum Nursing and Rehab. Ctr. of Winnie, Inc., v. Issacks*, No. 14-07-00895-CV, 2008 Tex. App. LEXIS 3672 at \*15 (Tex. App.–Houston [14th Dist.] May 22, 2008) (memo. op.), *citing Chaupin v. Schroeder*, No. 14-06-01102-CV, 2007 Tex. App. LEXIS 5837 (Tex. App.–Houston [14th Dist.] July 26, 2007, no pet.) (memo. op.) (holding that this was not relevant and pointing out that more than one act and more than one actor can be the proximate cause of same damages).

13

no pet. h.). However, Appellant grossly misconstrues the holding of this case and its applicability here. Following an automobile accident, the plaintiff in *Castro* received trauma care in the ICU after suffering severe injuries, including, but not limited to, fracture and dislocation of his cervical spine at C5–C6, multiple rib fractures, a collapsed lung, and damage to his right phrenic nerve. *Id*. at *1. The Corpus Christi Court of Appeals held that while plaintiff's reports detailed procedures necessary to prevent pressure ulcers in standard conditions, plaintiff's reports were deficient because they did not discuss the development of plaintiff's pressure ulcer in the specific trauma or ICU conditions present in Castro's care. *See Id*. at *18.

Clearly, the *Castro* holding is distinguishable from this case. First, the court in *Castro* connotes "conditions" to mean the ICU environment under which the plaintiff developed his pressure ulcer. *See Id*. at *3-6. Here, however, Appellant artfully attempts to suggest to this Court that the word "conditions" is synonymous with health issues, which is contrary to the word's implication in *Castro*. In *Castro*, a nurse and a physician were experts in the field of nursing home care, but not experts in the field of ICU or trauma care. *See Id*. at *4. In contrast, in this case, the relevant field of practice is the prevention and treatment of pressure ulcers in a nursing home setting. Dr. Davey makes clear in his amended Chapter 74 report that he is discussing the prevention and treatment of pressure ulcers in

14

the same conditions under which Appellant permitted the development and worsening of Ms. Bailey's pressure ulcer. Specifically, Dr. Davey discusses in detail how Ms. Bailey developed a pressure ulcer in the conditions, or setting, of being a patient at Appellant's nursing home. Similarly, Dr. Davey provides his opinion on the prevention of pressure ulcers within the context of a patient residing in a nursing home setting comparable to Appellant's. Thus, Appellant's contradictory argument that Dr. Davey's expert report is conclusory is grossly misfounded.

Appellant further argues that Dr. Davey fails to link his articulated breaches of the standard of care, such as Appellant's failure to adequately reposition Ms. Bailey or to perform accurate and consistent medical documentation, with the causes of Ms. Bailey's injuries. Such an assertion largely ignores the plain language of Dr. Davey's amended report. Appellant disregards Dr. Davey's comprehensive pathophysiological explanation regarding the formation of pressure ulcers and how the standards of care he previously articulated are intended to prevent development or worsening of pressure ulcers. For instance, multiple sections in the amended report state precisely the myriad of interventions that would have prevented Ms. Bailey from suffering a Stage IV pressure ulcer. Specifically, he says frequent and regular repositioning, pressure-relieving devices, proper nourishment, and consistent and accurate medical documentation are all

necessary health interventions for the prevention of pressure ulcers. (CR 148, 151-154, 157-158; Appendix A, p. 5, 8-11, 14-15). In fact, Dr. Davey explains that had Defendant implemented adequate interventions such as frequent turning and repositioning, initiation and follow through with pressure distribution devices, or regular assessment and monitoring of Ms. Bailey's skin, such interventions would have prevented Ms. Bailey's sacral ulcer from developing and encouraged healing once it developed. (CR 151-154, 157-158; Appendix A, p. 8-11, 14-15).

Within his causation section, Dr. Davey describes how a sore forms when there is a sustained pressure on a particular part of the body and expounds at length how interventions such as *frequent* repositioning and pressure-relieving devices would have greatly reduced the force of pressure on the skin. (CR 157-158; Appendix A, p. 14-15). As Appellant would like to mislead this Court to believe when it misstates that Dr. Davey's opinion on the nurses' failure to reposition is conclusory in that he relies on assumption that Ms. Bailey was never repositioned, Appellees would point the Court to where Dr. Davey states that the medical records fail to indicate that "nurses were *frequently* turning and repositioning" Ms. Bailey. (CR 152; Appendix A, p. 9). He opines that had appropriate interventions been implemented, such as *frequent* turning and repositioning and timely placement of pressure-relieving devices, such interventions would have offloaded the pressure to Ms. Bailey's sacral area to prevent the development and worsening

16

of the pressure ulcer. (CR 151-154, 157-158; Appendix A, p. 8-11, 14-15). To a reasonable degree of medical probability, Dr. Davey explains that Appellant's failures to reposition Ms. Bailey every two hours and implement the additional aforementioned interventions caused Ms. Bailey to endure sustained pressure on her sacral area, resulting in the pressure ulcer. (CR 157-158; Appendix A, 14-15).

To further illustrate his opinion, Dr. Davey discusses how Appellant's improper assessment, monitoring, and treatment would cause the pressure ulcer to worsen. (CR 151-155; Appendix A, p. 8-12). In addition to all of the other breaches that Dr. Davey links, Dr. Davey further bolsters his opinion with explanation of how accurate medical documentation is crucial to consistent medical care that will prevent and properly treat pressure ulcers. Specifically, Dr. Davey emphasizes Appellant's failure to present evidence documenting a *consistent* turning and repositioning schedule. (CR 152; Appendix A, p. 9). Even more, Dr. Davey further indicates how Appellant's failure to regularly, appropriately, and timely assess Ms. Bailey's skin with accurate and complete documentation can prevent skin breakdown and provide proper treatment of pressure ulcers. (CR 152-154; Appendix A, p. 9-11). For instance, Dr. Davey points to Appellant's nursing staff's failure to regularly assess Ms. Bailey, which is indicated by the lack of skin and wound care assessments in the nursing notes. (CR 153-154; Appendix A, p. 10-11). Consequently, Appellant's failure to accurately

17

and consistently document on Ms. Bailey's skin condition delayed pivotal communication to the attending physician of Ms. Bailey's worsening pressure ulcer and also prevented the implementation of an appropriate plan of care. (CR 152-153; Appendix A, p. 9-10). Had Appellant employed a proper care plan, Dr. Davey opines that appropriate interventions, such as crucial monitoring of skin integrity and tracking of the wound's progress, would have been implemented before the skin breakdown on Ms. Bailey's sacrum became a severe pressure ulcer. (CR 152; Appendix A, p. 9).

Walking the reader through the connections between Appellant's failures and the development and worsening of Ms. Bailey's pressure ulcer, Dr. Davey explicates with ease and clarity that because of the prolonged pressure exerted on Ms. Bailey's sacrum, blood was prevented from flowing to this part of her body. (CR 157-158; Appendix A, 14-15). As a result of the lack of blood flow, Dr. Davey notes that Ms. Bailey's skin was allowed to distort, causing the tissue to die and result in the development of an infected Stage IV sacral pressure ulcer. (CR 157-158; Appendix A, 14-15).

As can be extrapolated, Dr. Davey's meticulous explanation of how Appellant's failures to meet the standard of care more likely than not led to the injury that he concludes. Because Dr. Davey sufficiently opines that at least one theory of liability is linked to the development or worsening of Ms. Bailey's

18

pressure ulcers, Appellant's allegations of speculation are misplaced, and Plaintiff's claim must be allowed to proceed. Thus, Dr. Davey's causation opinion sufficiently linking the facts and medical science with his conclusion that Appellant's negligence caused a severe and infected Stage IV sacral ulcer is not conclusory and far surpasses the threshold requirements of Chapter 74.

For all of the reasons set forth above, Dr. Davey's amended report informs Appellant of the specific conduct in question by explaining, in detail, what the standard of care required and how it was breached by Appellant. Likewise, his amended report provides the Court with a basis to conclude Appellees' claims have merit by walking the Court through the facts of this case, explaining the pathophysiological process that leads to the development of a pressure ulcer, the worsening of a pressure ulcer, and then linking the facts and medical science with his conclusion that Appellant's negligence caused the development of a severe Stage IV pressure ulcer, infection, and malnutrition, from which Ms. Bailey suffered until her death. As such, Judge Kennedy did not abuse her discretion when holding that Dr. Davey's amended report comports with the threshold requirements of Chapter 74.

> **B.** **Because Appellees Did Not Assert a Wrongful Death Claim, Dr. Davey's Amended Expert Does Not Require Explanation of How Appellant's Failures to Meet the Standard of Care Caused Ms. Bailey's Death.**

With a lack of reverence for this Court's time, Appellant renews its

19

misguided argument that Dr. Davey is required to opine on how Appellant's breaches of the standard of care caused the death of Ms. Bailey. While Appellant devotes five pages of its brief and cites to a litany of inapposite cases in attempt to craft a creative argument, it can hardly support its own weight, especially in consideration of the underlying claims asserted in Appellees' Original Petition. The expert report requirement is a threshold mechanism to dispose of claims lacking merit. *Potts*, 392 S.W.3d at 631. The original and amended petitions inform a defendant of the claims against it and limit what a plaintiff may argue at trial. *Id* at 632. If an expert report adequately addresses a single liability theory within a cause of action, the entire case may proceed. *Id*. at 629-31.

As to the underlying survival claims filed against it, Appellant relies on *Valle v. Taylor* in attempt to deceive this Court as to what is required of Dr. Davey's causation analysis. The holding in *Valle* is clearly distinguishable. In *Valle*, the plaintiffs filed wrongful death and survival claims against a nursing home. *Valle v. Taylor*, No. 09-11-00223-CV, 2012 Tex. App. LEXIS 110, at *9 (Tex. App.—Beaumont Jan. 5, 2012, not pet.). The Beaumont Court of Appeals found the expert report deficient on causation with regard to plaintiff's wrongful death suit because it failed to explain how pressure ulcers were related to the patient's death. *See Id.* at *23.

To clarify Appellant's confusion, Appellees' Original Petition unequivocally

asserts only survival claims. (CR 1-12) (emphasis added). From the plain language of the Original Petition, it clearly states that Appellees "bring their survival claims as heirs of Archie Bailey." (CR 1-12). At no point within the Original Petition do Appellees assert a wrongful death claim. That is to say that Appellees make no contentions that Appellant's breaches in the standard of care caused the death of Ms. Bailey. Stated differently, Appellees' Original Petition, which limits what may be argued at trial and affords Appellant the explanation of the claims against it, does not at any point allege the pressure ulcer caused or contributed to Ms. Bailey's death. Accordingly, Dr. Davey is not required to opine on how Appellant's breaches of the standard of care caused the death of Ms. Bailey.

Because Dr. Davey's amended report sufficiently notifies Appellant of at least one liability theory, Plaintiffs have provided a report that complies with the statutory requirements set for in Chapter 74, and the entire case may proceed. Tex. Civ. Prac. & Rem. Code. Ann. §74.351; *Potts*, 392 S.W.3d at 629-31. As such, Judge Kennedy did not abuse her discretion when holding that Dr. Davey's amended report comports with Chapter 74.

## CONCLUSION AND PRAYER

Chapter 74 and corresponding Texas case law make clear that the expert report requirement is a threshold one, for which the objective is to preclude frivolous cases. Appellees' case, as demonstrated by their detailed expert report, is

21

clearly meritorious and more than satisfies the low burden required by Chapter 74. Because Dr. Davey's amended report sufficiently fulfills the requirements of an expert report under Chapter 74, the trial court was obligated to overrule Appellant's objections to Dr. Davey's amended report and deny its Motion to Dismiss.

Accordingly, for the foregoing reasons, Appellees respectfully request that this Court find that Judge Kennedy did not abuse her discretion, affirm the lower court's overruling of Appellant's objections to Dr. Davey's amended report, and to also affirm the lower court's decision to deny Appellant's Motion to Dismiss. Appellees additionally request any such further relief to which they may be justly entitled at law and in equity.

Respectfully submitted,

**MCIVER BROWN LAW FIRM**

Robert M. Wharton
Texas Bar No: 24079562
Andrea Zarikian
Texas Bar No: 24093411
Mary E. Green
Texas Bar No: 24087623
firm@mciverbrown.com
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
Telephone:  832-767-1673
Facsimile:  832-767-1783
**COUNSEL FOR APPELLEES**

**CERTIFICATE OF COMPLIANCE WITH RULE 9.4**

1.  This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4(i) because:

    this brief contains 4,739 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4

2.  This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because:

    this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in 14 point Times New Roman font for the text and 12 point Times New Roman font for the footnotes.

_____
Robert Wharton

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2015, a true and correct copy of the foregoing instrument was electronically filed and served by certified mail, return receipt request to the following counsel of record:

**Nichol L. Bunn**
**Stephanie F. Erhart**
**Lewis, Brisbois, Bisgaard & Smith, LLP**
**2100 Ross Avenue, Suite 2000**
**Dallas, Texas 75201**
**Telephone: (214) 722-7100**
**Fax: (214) 722-7111**

_____
Robert Wharton

25

# In The Court of Appeals
# For the First District of Texas
# Houston, Texas

PINECREST SNF, LLC D/B/A PINECREST
NURSING & REHABILITATION CENTER,
*Appellant,*

v.

TASCO BAILEY, NATHAN BAILEY, CURLIE BAILEY, ROY BAILEY,
BILL BAILEY, JAMES BAILEY, EARL BAILEY, MARY DUNLAP,
AND LUCILLE MARTIN, AS HEIRS OF ARCHIE BAILEY,
*Appellees*.

On Appeal from the 114th Judicial District Court of Smith County, Texas
The Honorable Christi Kennedy, Presiding Judge
(Trial Cause No. 14-0856-B)

## APPENDIX TO APPELLEES' BRIEF

| | |
|---|---|
| Dr. Davey's Amended Expert Report | Appendix A |
| Dr. Davey's Curriculum Vitae | Appendix B |

# APPENDIX A

I am providing this amended expert report in the Archie Bailey (also referred to herein as "the patient") matter. This report reflects my expert opinion regarding the standard of care and the proximate cause of injuries sustained by Ms. Bailey.

Summary of Findings

It is my opinion that Pinecrest Nursing & Rehab Center (also referred to herein as "Pinecrest Nursing") breached the standard of care by allowing Ms. Bailey's intact skin to deteriorate, which developed into an infected Stage IV pressure ulcer on her sacrum during the time of her stay (TR-000002 to TR-000005, TR-000712). Ms. Bailey was admitted to Pinecrest Nursing with intact skin. The standard of care requires facilities like Pinecrest Nursing to prevent pressure ulcers from developing and to promote the healing of any pressure ulcers that do develop. Pinecrest Nursing breached the standard of care by allowing Ms. Bailey to develop a pressure ulcer and by allowing the pressure ulcer to progress to a Stage IV. Specifically, Pinecrest Nursing failed to implement adequate interventions to offload sustained pressure on Ms. Bailey's sacrum for extended periods of time. The sustained pressure caused Ms. Bailey's soft tissues to become distorted and die, which caused the Stage IV pressure ulcer. Ms. Bailey suffered harm as a result of the infected pressure ulcer, including surgical debridement, wound VAC placement, and intravenous (IV) antibiotics to treat her infections (TR-000055, TR-000311 to TR-000312, TR-000840 to TR-000842).

Qualifications

I am a licensed physician who has actively been practicing medicine since 1981. After graduating from medical school in 1972, I did internships in cardiology, general surgery, and internal medicine and a residency in anatomical and clinical pathology. Initially I served as an emergency medicine physician at Columbia Edward White Hospital in Saint Petersburg, Florida, where I served as the Emergency Room Director for three years. Since 1987, I have actively and continuously practiced full-time Family Practice/Geriatric Medicine in office, hospital, and nursing home settings. In addition to my general adult and geriatric medicine practice, I have a special interest in skin care and wound care. As such, I have been board certified by the American Academy of Wound Management as a Wound Specialist since 1987. Currently, I practice internal medicine and geriatric medicine at the Edward White Center for Wound Care and Hyperbaric Medicine, where I have served as the Medical Director of Hyperbarics since 2011, and I hold admitting privileges at Edward White Hospital and St. Anthony's Hospital.

From 1988 to 1999, I served as the Medical Director of Heartland Nursing Home. I also served as the Medical Director of Huber Nursing Home from 1992 to 2000 and as the Medical Director of St. Pete Health Care Center from 1992 to 1995. From 1995 to 1998, I was the Medical Director of Alpine Nursing Home, and from 1995 to 1997, I was the Medical Director of Carrington Place Nursing Home. Beginning in 1996, I served as the Medical Director of Shore Acres Nursing Home for two years. I was the Medical Director of Abbey Nursing Home from 1998 to 2000 and the Medical Director of Northshore ALF from 1998 to 2002. From 2000 to 2007, I served as the Medical Director of Coquina Key Nursing and Rehabilitation Center, and from 2001 to 2005, I

1

served as the Medical Director of Westminster ALF. In addition to my ten medical director positions over the past twenty years, I have also served as a board member of the Florida Medical Director's Association. I also served/serve on the Utilization Review and Quality Assurance Committee at HCA Edward White Hospital and Columbia Edward White Hospital and on the Medical Quality and Education Committee at St. Anthony's Hospital. I have also held admitting privileges at Edward White Hospital and St. Anthony's Hospital in St. Petersburg, Florida since 1987. Since I began practicing medicine in 1981, I have overseen staff members such as nurses and nurse assistants in hospitals and nursing homes. Through these various positions, I have become very familiar with the minimum standard of care required of these healthcare providers.

By virtue of my training, education, and experience in the area of internal medicine and geriatric medicine, I have knowledge regarding the procedures, diagnoses, treatments, and conditions that are involved in this case, of the applicable standard of care, and of the opinion, which I am rendering in this amended expert report. Specifically, based on my training, education, and experience, I have direct knowledge concerning the standard of care applicable to pressure ulcer prevention, treatment orders, and patient care planning such as that care provided to Archie Bailey at Pinecrest Nursing & Rehab Center. In particular, as part of my training, education, and experience, I have provided health care to patients such as Ms. Bailey in the hospital and/or nursing home and worked with and supervised nurses, staff members, and other healthcare providers in connection with such care. Further, based on my training, education, and experience in working with and supervising nurses, nurse assistants, and other medical staff in the area of internal medicine and geriatric medicine, I have knowledge of and am familiar with the applicable standards of care as they pertain to physicians, nurses, nurse assistants, and staff regarding their duties and obligations in performing and carrying out the procedures and treatments under the circumstances at issue in this case, which led to the injuries of Ms. Bailey on 9-17-13, which contributed to her death on 12-4-13.

I have seen patients like Ms. Bailey who received care that met the applicable standards of care set forth in this report who did not develop pressure ulcers. On the other hand, I have also seen patients like Ms. Bailey where the standards of care were not met and pressure ulcers developed or got worse. Based on my training and education, I understand not just what the standard of care requires, but also what is likely to occur if the standard of care is not met. Therefore, I am qualified based on my education, training, and experience to render the opinions in this report.

Materials Reviewed

In preparing this report, I have reviewed the medical records of: (1) Pinecrest Nursing & Rehab Center, (2) Trinity Mother Frances Hospital, (3) Tyler Continue Care Hospital, (4) The University of Texas Health Science Center at Tyler, (5) Colonial Tyler Care Center, and (6) the death certificate of Ms. Bailey. I base my opinions on the items I reviewed and my knowledge of the standard of care with which I am familiar because of my education, training, and experience. These records provide a sufficient basis for my

2

opinion regarding the applicable standard of care, and that the breaches in the standards of care by Pinecrest Nursing were the proximate cause of injuries to Ms. Bailey.

Factual and Medical Background

Based on my review of the medial records referenced above, the following is a summary of events that led to Ms. Bailey's injuries.

Ms. Bailey, an 88-year-old female, was admitted to Pinecrest Nursing on 6-12-10 for long-term care for Alzheimer's disease (TR-001972). She had a history of hypertension, congestive heart failure, diabetes mellitus, and asthma (TR-001970 to TR-001971). Upon admission to Pinecrest Nursing, Ms. Bailey's skin was warm, dry, and intact (TR-002227, TR-002533). According to the documentation in the medical records, Ms. Bailey was incontinent of bowel and bladder and required total assistance with all of her Activities of Daily Living (TR-002184, TR-002252). A Braden Skin assessment was performed on 1-1-13, and Ms. Bailey was assessed as having a moderate risk for developing pressure ulcers with a score of 13 (TR-001977). She was also noted to have adequate nutrition levels (TR-001977).

On 3-20-13, nurses noted a 0.2 x 0.2 cm excoriated area to Ms. Bailey's left sacrum with granulated tissue and a scant amount of serous drainage present (TR-001983). However, by 4-3-13, this area was described as "improved" by the nursing staff, and no open areas were found (TR-001983). According to the documentation in the weekly non-pressure skin condition report, Ms. Bailey had no skin problems from April 2013 until the beginning of August 2013 (TR-001983 to TR-001988). On 8-12-13, the nursing staff at Pinecrest Nursing noted a 0.3 x 0.2 cm macerated area on Ms. Bailey's gluteal fold (TR-001989). The area of skin breakdown on Ms. Bailey's sacral area had developed a scant amount of serous exudate by 8-19-13, and nurses noted the area had "deteriorated" (TR-001989).

Several days later, on 8-22-13, a Stage II pressure ulcer was discovered on Ms. Bailey's sacral area that measured 1.0 x 0.3 cm and had a small amount of serous exudate present (TR-001978). Ms. Bailey began to experience a "continuous" and "aching" pain from her sacral ulcer on 9-3-13, and at this time, her Stage II pressure ulcer had increased in size to 0.8 x 1.0 x 0.2 cm (TR-001979). On 9-12-13, the nursing staff failed to stage the wound, but they noted measurements of 2.0 x 2.0 x 2.0 cm and the presence of serosanguineous drainage (TR-001979). By 9-17-13, Ms. Bailey had an unstageable pressure ulcer on her sacrum that measured 8.0 x 15.0 x >2.0 cm (TR-001980). According to the documentation in the weekly pressure ulcer record, the wound had a moderate amount of serosanguineous exudate and was causing Ms. Bailey a significant amount of pain (TR-001980).

On 9-19-13, Ms. Bailey was discharged from Pinecrest Nursing and transferred to Trinity Mother Frances Hospital for elevated white blood cell count of 20.6 thou/mm$^3$ (TR-000002, TR-001972, TR-002528). Upon admission to the ER at Trinity Mother Frances Hospital, Ms. Bailey was diagnosed with a Stage IV decubitus ulcer on her sacrum,

3

leukocytosis, and a urinary tract infection (UTI) (TR-000002, TR-000005). Cultures taken from the wound on her sacrum later revealed the presence of *Proteus mirabillis* (TR-000007, TR-000712). She also had a Stage II pressure ulcer on her left buttock (TR-000026). That same day, Ms. Bailey was transferred to Tyler Continue Care Hospital for further management of her wounds (TR-000006, TR-000061).

Upon admission to Tyler Continue Care Hospital, Ms. Bailey had a Stage IV sacral ulcer that measured 11.0 x 12.0 x 3.0 and had a foul odor (TR-000285, TR-000483). The wound had a small amount of green purulent drainage and was covered in black eschar (TR-000285, TR-000930). Ms. Bailey also had a Stage II pressure ulcer on her left buttock that measured 3.0 x 3.0 x 0.25 cm and a Stage II pressure ulcer on her right buttock that measured 5.0 x 5.0 x 0.1 cm (TR-000285). Both buttock wounds had a small amount of serosanguineous drainage present (TR-000285). According to her dietary consult on 9-20-13, Ms. Bailey was malnourished, and her nutritional status was described as "severely compromised" (TR-000285). Her lab values from 9-19-13 revealed an albumin of 2.4 g/dL, for which a normal range is 3.9-5.0 g/dL, and a pre-albumin of 58 mg/L, for which a normal range is 176-360 mg/L (TR-000011, TR-000283, TR-000701, TR-002529). Ms. Bailey's low pre-albumin level suggested severe visceral protein depletion (TR-000283).

According to the wound care consult on 9-24-13, the pressure ulcer had a "foul malodorous odor," and the surrounding peri-wound area had excoriated non-blanchable redness (TR-000842). On 9-26-13, Ms. Bailey underwent excisional debridement of necrotic tissue from her sacral wound as well as partial excision of portions of bone of the involved coccyx (TR-000311 to TR-000312). The bone sample later revealed reactive changes and acute inflammation, indicating possible osteomyelitis (TR-000448). Following debridement, the wound measured 11.5 x 8.0 x 6.0 cm with moderate serosanguineous drainage and 5.0 cm of undermining, and the two buttocks wounds had become part of the sacral wound (TR-000842, TR-000908 to TR-000909). A wound VAC was placed on the sacral ulcer to promote healing, and IV antibiotics were administered to treat Ms. Bailey's infections (TR-000055, TR-000167, TR-000842).

On 9-30-13, Ms. Bailey underwent another surgical debridement of her Stage IV pressure ulcer, and following the procedure, the wound measured 11.0 x 7.0 x 7.0 cm (TR-000842). The wound VAC was changed, and the negative pressure treatment was continued (TR-000842). Ms. Bailey's sacral ulcer was debrided two more times before her discharge on 10-22-13 (TR-000840 to TR-000841).

On 10-22-13, Ms. Bailey was admitted to Colonial Tyler Care Center for continued wound care and nutritional therapy (TR-002566 to TR-002569). She continued to receive negative pressure therapy from a wound VAC as well as a therapeutic diet to promote wound healing (TR-002617, TR-002635). As of 11-6-13, Ms. Bailey's sacral pressure ulcer measured 11.0 x 9.0 x 6.0 cm (TR-002644). Unfortunately, her condition failed to improve, and she was placed on hospice care. On 12-4-13, Ms. Bailey expired from cardio pulmonary arrest, as indicated on her death certificate (TR-002743). However, it is my opinion, to a reasonable degree of medical probability, that Ms.

4

Bailey's large and infected pressure ulcer was a significant, contributing factor to her death.

Following my review of the medical records in this matter, it is my opinion that the staff at Pinecrest Nursing violated the standard of care. For the purpose of this report, I will discuss the standard of care, breach of standard of care, and proximate causation.

## Pinecrest Nursing & Rehab Center

### Relevant Standards of Care

**First: Prevent Avoidable Pressure Ulcers.** Medicare and Medicaid provide rules that require long term care facilities to provide a base level of care. Failure to meet the level of care provided by the rules found in 42 CFR 483, Subpart B is a violation of the regulations intended to protect residents. It is also an indication of a violation of the standard of care by the staff of the facility and the administration of the facility. Section 483.25(c)(1) provides that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that the sores were unavoidable and that a resident who develops pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. The purpose of this is to prevent residents from getting pressure ulcers and to promote behavior that allows for the healing of decubitus ulcers. There are a number of interventions that exist to prevent pressure sores that are identified and explained in more detail below. For example, the standard of care requires that a patient be turned, provided with pressure-relieving devices, be kept clean and dry, and be kept properly nourished. The standard of care also requires that a patient receive frequent head-to-toe body examinations to look for early signs of skin problems.

One additional source regarding the standard of care is the National Pressure Ulcer Advisory Panel. The NPUAP is a collection of experts tasked with creating treatment algorithms that show the proper method for preventing pressure ulcers. In 2009, the NPUAP published a 26-page reference guide on how to prevent pressure ulcers. This reference guide, which is available under the educational and clinical resources tab of the NPUAP website (www.npuap.org), provides a detailed description of what the standard of care requires.

The NPUAP identifies eight things that health care providers should address when caring for a patient at risk of developing pressure ulcers:

1. Pressure ulcer risk assessment: The standard of care requires health care providers to conduct a structured risk assessment on admission and as frequently and as regularly required based on patient acuity. In addition, health care providers should reassess the patient's risk level if the patient has a change in condition. The purpose of the assessments is to gauge the patient's risk of developing a pressure ulcer and to ensure a proper plan of

5

06/26/14    05:32PM    HP LASERJET FAX    7278272966    p.06

care is implemented to prevent a pressure ulcer from developing.

2.    Skin assessment: Likewise, the standard of care requires health care providers to perform assessments to determine the integrity of the patient's skin and to determine whether a change in the care plan is necessary. Skin assessments should be performed regularly, although the frequency of inspection may need to be increased if there is any deterioration in the patient's overall condition.

3.    Skin care: The standard of care requires providers to care for the skin in a manner that prevents breakdowns. This includes, for example, not turning a patient onto a body part that is still reddened from a previous episode of pressure loading.

4.    Nutrition: Because a decline in nutritional status can lead to skin breakdown, the standard of care requires providers to ensure patients are receiving adequate nutrition. This includes offering high-protein supplements and/or tube feeding, in addition to the usual diet, to patients with nutritional risk. It is important that health care providers communicate with the dietary team to ensure the patient does not become malnourished.

5.    Repositioning: The standard of care also requires providers to frequently and regularly reposition patients to prevent sustained pressure being applied to the same part of the body for an extended period of time.

6.    Mattress and bed use: Because special devices can also offload pressure to parts of the body, the standard of care requires providers to install special devices, such as low air mattresses, for high-risk residents.

7.    Support surfaces while seated: For high-risk patients, the standard of care requires health care providers to consider and use support surfaces, such as wheelchair cushions, to offload pressure to parts of the body while the patient is seated.

8.    Other support surfaces: The standard of care also requires providers to avoid devices that would promote skin breakdowns, such as cutout, ring or donut-type devices.

Failing to do any of the above is a breach of the standard of care.

**Second: Properly treat pressure ulcers.** The standard of care also requires that a resident who has pressure sores must receive the necessary treatment and services to promote healing and prevent infection. This standard of care is supported by Title 42, Code of Federal Regulations, Section 483.25(c)(2). The purpose of this requirement is to promote behavior that allows for the healing of decubitus ulcers. There are a number of

6

interventions that exist to promote healing and prevent further skin breakdown. For example, the standard of care requires that a patient be positioned so that pressure on the ulcer is relieved, the patient is kept clean and dry, and the patient is provided with adequate nutrition to support healing. The pressure ulcer and surrounding skin should also be cleansed at the time of each dressing change. Appropriate dressing and treatments should be used, or the ulcer is unlikely to heal, as was the case here. The standard of care also requires that a facility and its nurses intervene such that a patient who has ulcers heals. The standard of care also requires that regular and complete assessments be performed and documented so that the necessary interventions can be implemented. Failing to do any of the above is a breach of the standard of care.

**Third: Implement 40 Texas Admin. Code, Rule 19.001.** Another source of requirements that nursing homes must meet is Title 40, Chapter 19 of the Texas Administrative Code. The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001 states (a) the facility must have sufficient staff to provide 24-hour nursing and related services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, as determined by resident assessments and individualized plans of care. When treating a patient with a high risk of developing pressure ulcers, a facility and its agents must properly and regularly assess the patient, including daily and complete skin assessments, proper documentation of the patient's daily activities, and monitoring the patient's body weight. Such accurate and complete documentation is necessary to properly assess and implement optimal nursing interventions. In addition, staffing levels should reflect the complexity of the care required, the size of the facility, and the type of services delivered. This means that the training, selection, and supervision of the staff must be sufficient to handle the nursing care that is needed by the residents who are accepted into the facility.

The history behind the nursing home regulations informs about its purpose. In the past, most nurses in nursing homes had little or no formal training in gerontology and long-term care (IOM, 1986). Many nursing home attendants or aides had no formal training. In 1986, only 17 states had mandated training requirements for nursing attendants, and there were no federal standards for training (IOM, 1986). In a 1986 study, conducted at the request of Congress, the Institute of Medicine found that residents of nursing homes were being abused, neglected, and given inadequate care. The Institute of Medicine proposed sweeping reforms, most of which became law in 1987 with the passage of the Nursing Home Reform Act, part of the Omnibus Budget Reconciliation Act of 1987. The basic objective of the Nursing Home Reform Act was to ensure that residents of nursing homes received quality care that resulted in their achieving or maintaining their "highest practicable" physical, mental, and psychosocial well-being.

**Fourth: Implement The Nursing Home Reform Act of 1987.** To secure quality care in nursing homes, the Nursing Home Reform Act requires the provision of certain services to each resident and establishes a Residents' Bill of Rights. Nursing homes receive Medicaid and Medicare payments for long-term care of residents only if they are certified by the state to be in substantial compliance with the requirements of the Nursing Home

Reform Act. The purpose of these reforms was to ensure that facilities had sufficient staff that was sufficiently trained and supervised to provide quality care to the residents. Such training and supervision are especially important when it comes to care of dependent residents. Failing to have a staff that is sufficiently trained and supervised, which includes the facilities policies as well as the implementation of those policies, to attain and maintain the highest practicable physical, mental and psychosocial well-being of the residents is a violation of the standard of care applicable to nursing homes.

## Breaches of Standards of Care

Over the course of the care of Ms. Bailey, it is clear that Pinecrest Nursing violated the standard of care in the following respects:

**First:** Failing to prevent a pressure sore;
**Second:** Failing to properly treat the patient's pressure ulcers once they developed;
**Third:** Failing to implement The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001; and
**Fourth:** Failing to implement The Nursing Home Reform Act of 1987.

**First:** Pinecrest Nursing violated the standard of care by failing to prevent a pressure ulcer from occurring, which was a proximate cause of harm to Ms. Bailey. This standard of care mandates that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable and that a resident who has pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. Ms. Bailey was admitted to Pinecrest Nursing without any pressure ulcers (TR-002227, TR-002533). The Braden Skin Score is used to assess a resident's risk for developing pressure ulcers. According to Pinecrest Nursing, Ms. Bailey was not a high risk of developing pressure ulcers with a Braden Score of 13 (TR-001977). On 7-1-13, the nursing staff assessed Ms. Bailey as only being a moderate risk for the development of pressure ulcers (TR-001977). In my professional opinion, this is not an accurate assessment of Ms. Bailey's risk level. At the time of this assessment, Ms. Bailey required extensive assistance for all her Activities of Daily Living, including bed mobility, and she had a history of generalized weakness and debility, which would have severely limited her from freely repositioning herself (TR-002018 to TR-002019, TR-002184, TR-002252 to TR-002253). Despite these factors, she was assessed as "chairfast" when she should have been assessed as "bedfast" (TR-001977). Furthermore, given Ms. Bailey's age, her skin would have been thin, dry, and susceptible to friction and shear; yet, the Braden Skin assessment described her as having only a "potential problem" for friction and shear (TR-001977, TR-002252 to TR-002253). She was also incontinent of bowel and bladder, which would have significantly increased her risk for skin breakdown (TR-002254). With such inaccurate assessments, the nursing staff at Pinecrest Nursing would not have initiated the appropriate interventions required for Ms. Bailey's actual risk level. Because Ms. Bailey actually had a high risk of developing pressure ulcers, Pinecrest Nursing had the duty to institute interventions to prevent skin breakdown, such as those recommended by the NPUAP.

8

There is no evidence within the medical records that adequate preventive measures, such as those recommended by the NPUAP, were implemented to prevent Ms. Bailey's sacral ulcer from developing. Despite Ms. Bailey's high risk for skin breakdown, nothing in the medical records suggests that the nurses were frequently turning and repositioning her, even after skin breakdown was discovered on her sacrum (TR-001978 to TR-001989, TR-002030 to TR-002076). By 6-1-13, Ms. Bailey was completely dependent on the nursing staff for all of her Activities of Daily Living, and she required extensive assistance to change positions while in bed (TR-002252). With a resident like Ms. Bailey, nurses should be repositioning the resident at least once every two hours. However, the medical records fail to present any evidence that Ms. Bailey's turning/repositioning schedule was ever documented, which suggests she was not repositioned every two hours as required by the standard of care (TR-002030 to TR-002076). Over the course of Ms. Bailey's entire stay at Pinecrest Nursing, there are no entries in the nursing notes indicating the resident was ever repositioned (TR-002030 to TR-002058). Similarly, there is no evidence within the medical records that any special devices were used to offload pressure from Ms. Bailey's sacral area until after she developed a pressure ulcer (TR-001978, TR-002030 to TR-002076). Although Ms. Bailey developed skin breakdown on 8-12-13, a low air mattress was not mentioned until 8-22-13, when the nursing plan of care was updated (TR-001989, TR-002098). Even though a low air loss mattress was mentioned in this revised plan of care, the medical records do not reflect that the nurses ever initiated and followed through with this intervention (TR-002030 to TR-002076).

Furthermore, there is no evidence in the medical records that Ms. Bailey's skin was regularly, appropriately, and timely assessed and that such assessments were accurately and completely documented to implement optimal and necessary interventions to prevent the occurrence of a pressure ulcer (TR-001981 to TR-001989, TR-002030 to TR-002076). Not only did the nurses at Pinecrest Nursing inaccurately assess Ms. Bailey's risk of pressure ulcer development, they failed to implement an appropriate plan of care to prevent skin breakdown (TR-001977, TR-002094 to TR-002098). Care plan meetings were held on 1-17-13 and 4-11-13, but Ms. Bailey's risk of skin breakdown was never discussed (TR-002094, TR-002097). Although "preventative care" was mentioned in the 4-10-13 nursing plan of care regarding Ms. Bailey's skin integrity, the nursing staff failed to list any specific interventions (TR-002095). On 8-12-13, a "macerated area" was discovered on Ms. Bailey's gluteal fold (TR-001989). Despite this change in condition, the nursing plan of care was not updated, and specific interventions were not listed, until 8-22-13 (TR-002098). By this time, Ms. Bailey had already developed a Stage II pressure ulcer (TR-001978). While this change in condition was documented in the non-pressure ulcer report, it was never mentioned in any of the entries in the nursing notes (TR-001989, TR-002030 to TR-002076). Not only is accurate and complete documentation necessary to properly assist and properly implement optimal nursing interventions, it is crucial to monitor skin breakdown and track a wound's progress. The medical records here demonstrate both inaccurate and inconsistent documentation. If Pinecrest Nursing and its nursing staff had properly assessed and documented Ms. Bailey's skin breakdown, and properly updated the plan of care, the appropriate

9

interventions could have been implemented before the skin breakdown on Ms. Baily's sacrum became a severe pressure ulcer (TR-001978 to TR-001980, TR-001989). Because the nurses and staff did not ensure that Ms. Bailey, who entered the facility with intact skin, did not develop a pressure ulcer, the facility and the nurses breached the standard of care.

**Second:** Pinecrest Nursing violated the standard of care by failing to promote the healing of Ms. Bailey's sacral pressure ulcer. If a resident has already developed pressure ulcers, appropriate nursing interventions can be implemented to promote the healing of these ulcers. While progress is slow, continued care and treatment can prevent complications such as further tissue damage, infection, and pain. After reviewing the medical records, it is clear that the assessments, treatments, and interventions described above were not performed here. First, once the skin breakdown was discovered on Ms. Bailey's sacrum on 8-12-13, the nursing staff at Pinecrest Nursing should have been frequently monitoring the area of skin breakdown, documenting any changes in condition, and describing the progression of the wound. Instead, the nurses waited a week to reassess Ms. Bailey's area of skin breakdown, and by that time, it had deteriorated into a Stage II pressure ulcer (TR-001978, TR-001989). On 9-12-13, the nurses assessed the pressure ulcer as measuring 2.0 x 2.0 x 2.0 cm, but they failed to stage it (TR-001979). Five days later, Ms. Bailey's sacral ulcer had become unstageable (TR-001980). When an ulcer is classified as unstageable, it means that the ulcer is at least Stage III or Stage IV, but the ulcer is heavily covered in necrotic tissue, preventing health care providers from seeing how deep the injury extends under the skin. On 9-17-13, Ms. Bailey's unstageable pressure ulcer measured 8.0 x 15.0 x >2.0 cm with a moderate amount of serosanguineous drainage, according to the documentation in the weekly pressure ulcer record (TR-001980). That same day, the wound was assessed for the first time in the nursing notes, and the entry described the wound as "deteriorated" with measurements of 18.0 x 10.0 cm (TR-002053). According to the nursing notes, the wound had 100% necrotic tissue, and its depth was unable to be measured (TR-002053). The medical records here demonstrate both inaccurate and inconsistent documentation. Proper assessment is necessary for proper treatment of pressure ulcers. Measurement and accurate description of wounds is crucial to track a wound's progress and response to treatment. By the time Ms. Bailey transferred to the ER at Trinity Mother Frances Hospital, she had an infected Stage IV pressure ulcer (TR-000002 to TR-000005). If Pinecrest Nursing and its nurses had properly assessed and documented Ms. Bailey's pressure ulcer, the appropriate interventions could have been implemented before the wound progressed to a Stage IV pressure ulcer (TR-TR-000002 to TR-000005).

Not only is accurate and complete documentation necessary to properly assess and properly implement optimal nursing interventions, it also assists other members of the facility, such as physicians and dieticians, to treat the patient's conditions promptly and correctly. The nursing staff at Pinecrest Nursing failed to regularly assess Ms. Bailey's pressure ulcer as indicated by the lack of skin and wound care assessments in the nursing notes (TR-002030 to TR-002076). Because the nurses failed to accurately and consistently document the status of Ms. Bailey's pressure ulcer and provide adequate and detailed descriptions, the attending physician was not notified of Ms. Bailey's worsening

10

pressure ulcer for over two weeks (TR-002048). As a result, a wound care consultation and wound care treatments were not ordered for Ms. Bailey until after her sacral ulcer had developed a depth of 0.2 cm, which was indicative of a Stage III pressure ulcer (TR-001979, TR-002001 to TR-002002, TR-002048, TR-002531). Aside from these orders, Ms. Bailey's pressure ulcer was never mentioned in any of the physician's progress notes or consultations (TR-001990 to TR-001992). The nurses caring for Ms. Bailey should have brought the wound and the fact that it was becoming necrotic to the attending physician's attention, both by accurately documenting their assessment of the wound in the records and by verbally reporting it to one of the physicians. Nurses are required to relay a patient's changes in condition to the attending physician, such as further skin breakdown, such that a physician could evaluate the necessity of interventions such as a low air mattress or a wound consult. If the nurses at Pinecrest Nursing had notified the attending physician of Ms. Bailey's change in condition sooner, the proper interventions could have been implemented before Ms. Bailey's pressure ulcer became unstageable (TR-001980).

Finally, the nursing staff at Pinecrest Nursing should have paid closer attention to Ms. Bailey's nutritional status. In order to promote skin integrity, it is vital that a resident receives adequate nutrition and hydration. As mentioned in the medical summary, Ms. Bailey was admitted to Pinecrest Nursing with adequate nutrition levels (TR-001977). Despite Ms. Bailey's development of a pressure ulcer, the nursing staff at Pinecrest Nursing failed to monitor the resident's laboratory values (TR-002519 to TR-002529). As a result, the nurses were unable to assess Ms. Bailey's nutritional status, and were therefore unaware of her worsening albumin and pre-albumin levels throughout her stay at Pinecrest Nursing. While a multivitamin was administered, additional interventions such as providing snacks between meals, fortifying meals, and/or providing smaller, more frequent meals were never initiated (TR-002000). Pressure ulcer development or the presence of a chronic non-healing pressure ulcer places increased metabolic demands on a patient. Without immediate and assertive nutritional intervention to provide the raw materials to meet this increased demand for energy, initiate wound closure, and replace potential losses during the wound healing process, healing will be delayed. Ms. Bailey's lab values were not taken until 9-19-13, the day of her discharge (TR-002529). By this time, she had an albumin level of 2.4 g/dL, indicating malnutrition (TR-002529). Upon admission to the ER at Trinity Mother Frances Hospital, she was diagnosed with protein calorie malnutrition and had a pre-albumin level of 58 mg/L (TR-000011, TR-000057). The failure of the nurses to institute appropriate interventions required to stabilize Ms. Bailey's skin integrity, maintain her nutritional status, and prevent complications was clearly a breach in the standard of care.

**Third:** Pinecrest Nursing violated the standard of care by failing implement The Texas Administrative Code, Title 40, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001 by not providing sufficient staff to provide 24-hour nursing care and related services reflecting the complexity of the care required, the size of the facility, and the type of services necessary to attain or maintain the highest practicable physical, mental and psychosocial well-being of Ms. Bailey, as determined by the resident assessments and individualized plans of care. When a resident does not

11

receive frequent and regular assessments and care, it is indicative of an insufficient staff level. If staffing levels had been appropriate, there would have been nurses and/or staff available to attend to Ms. Bailey. The failure of the facility to provide sufficient staff and to provide 24-hour nursing care and related services is a breach in the standard of care.

**Fourth:** Pinecrest Nursing violated the standard of care applicable to nursing homes by failing to properly train and supervise its staff and by failing to have policies in place that are designed to maintain the highest practicable physical, mental, and psychosocial well-being of Ms. Bailey. Had the care to Ms. Bailey been provided by sufficiently trained staff and based on well-conceived policies and procedures, appropriate and timely care plans would have been implemented and interventions would have been put in place which would have prevented Ms. Bailey from developing a Stage IV pressure ulcer (TR-000002 to TR-000005). As a result, Pinecrest Nursing breached this standard of care.

## Causation

The following is an explanation of how, to a reasonable degree of medical probability, the breaches of the standard of care identified above proximately caused Ms. Bailey's injuries, including the development of a Stage IV pressure ulcer.

To understand how a pressure ulcer is caused by the negligence of a nursing staff and a facility, it is first important to understand what a pressure ulcer is and what happens to the body to allow them to develop.

### *What is a pressure ulcer?*

Pressure ulcers, also known as decubitus ulcers or bedsores, are localized injuries to the skin and/or underlying tissue usually over a bony prominence, as a result of pressure, or pressure in combination with shear and/or friction. Most commonly they are found on the sacrum, coccyx, heels or the hips, but other sites such as the elbows, knees, ankles, or the back of the cranium can be affected. They range in severity from mild (minor skin reddening) to severe (deep craters down to muscle and bone).

### *What causes a pressure ulcer to develop?*

Pressure ulcers occur when soft tissues are distorted in a fixed manner over a period of time. This distortion usually occurs when the soft tissues are compressed and/or sheared between the skeleton and a supportive device (such as a bed or chair). This causes the blood vessels within the distorted tissue to become compressed, angulated, or stretched out of their usual shape. As a result, blood is unable to pass through the vessels. When blood is unable to pass through the vessels, the distorted tissues become ischemic. Ischemia is the shortage of oxygen and nutrients needed to keep tissue alive. If ischemia occurs for an extended length of time, then death of the tissue occurs, a process known as necrosis.

12

Other factors cause pressure ulcers, too. If a person slides down in the bed or chair, blood vessels can stretch or bend and cause pressure ulcers. Even slight rubbing or friction on the skin may cause minor pressure ulcers.

***How does the failure to comply with the standard of care cause severe pressure ulcers?***

The standards of care discussed above related to preventing pressure ulcers all focus on identifying those at risk for the development of pressure ulcers and providing the interventions necessary to prevent the development of the ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate measures to assess a person's risk for developing a pressure ulcer, then the person does not receive the necessary care to prevent the development of ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate interventions to prevent the development of ulcers, then the patient or resident is more likely than not going to develop ulcers.

Once an ulcer develops, the standard of care shifts from prevention to treatment, as detailed above. According to the recommendation of the National Pressure Ulcer Advisory Panel (NPUAP) Consensus Development, the following describes the staging of pressure ulcers:

Stage 1
Nonblanchable erythema of intact skin, the heralding lesion of skin ulceration. In individuals with darker skin, discoloration of the skin, warmth, edema, induration, or hardness may also be indicators. A Stage I pressure ulcer is an observable pressure related alteration of intact skin whose indicators as compared to the adjacent or opposite area on the body may include changes in one or more of the following: skin temperature (warmth or coolness), tissue consistency (firm or boggy feel) and/or sensation (pain, itching). The ulcer appears as a defined area of persistent redness in lightly pigmented skin, whereas in darker skin tones, the ulcer may appear with persistent red, blue, or purple hues.

Stage 2
Partial thickness skin loss involving epidermis, dermis, or both. The ulcer is superficial and presents clinically as an abrasion, blister, or shallow crater.

Stage 3
Full thickness skin loss involving damage to or necrosis of subcutaneous tissue that may extend down to, but not through, underlying fascia. The ulcer presents clinically as a deep crater with or without undermining of adjacent tissue.

Stage 4
Full thickness skin loss with extensive destruction, tissue necrosis, or damage to muscle, bone, or supporting structures (e.g., tendon, joint capsule). Undermining and sinus tracts also may be associated with Stage

13

4 pressure ulcers.

<u>Unstageable/Unclassified</u>
Full thickness tissue loss in which the base of the ulcer is completely covered by slough (yellow, tan, gray, green or brown) and/or eschar (tan/brown or black) in the wound bed. Until enough slough and/or eschar is removed to expose the base of the wound, the true depth and stage cannot be determined. However, it will be either a Stage III or Stage IV.

<u>Suspected Deep Tissue Injury</u>
Purple or maroon localized area of discolored intact skin or blood-filled blister due to damage of underlying soft tissue from pressure and/or shear. The area may be preceded by tissue that is painful, firm, mushy, boggy, warmer or cooler as compared to adjacent tissue. Deep tissue injury may be difficult to detect in individuals with dark skin tones. Evolution may include a thin blister over a dark wound bed. The wound may further evolve and become covered by thin eschar. Evolution may be rapid exposing additional layers of tissue even with optimal treatment.

The standards of care related to treatment are intended to prevent ulcers from progressing from a Stage I or Stage II wound to a Stage III or Stage IV wound. When insufficient care is provided to treat ulcers and the ulcer progresses to a Stage III or a Stage IV wound, then the patient or resident suffers a number of complications directly caused by the failure to assess, prevent, and treat ulcers.

***How do severe pressure ulcers impact residents and patients?***

First, and most obviously, Stage III and Stage IV pressure ulcers impact the skin. These ulcers cause skin loss with extensive destruction, tissue necrosis, and damage to muscle, bone, tendons, and other supporting structures. Second, patients and residents who have severe ulcers have an increased morbidity and mortality rate. Third, patients and residents who have severe ulcers become susceptible to infection and other medical complications related to the wound and its treatment. Fourth, the patients and residents who develop severe ulcers have problems with pain and loss of dignity associated with the wound and its treatment.

***How did the breaches of the standard of care in this case cause Ms. Bailey to develop a severe pressure ulcer?***

In my opinion, to a reasonable degree of medical probability, the breaches of the standard of care discussed above related to the assessment, prevention, and treatment of severe pressure ulcers were the proximate cause of Ms. Bailey's severe pressure ulcer. As stated above, Pinecrest Nursing and its nursing staff failed to reposition Ms. Bailey every two hours, keep her skin clean and dry, and implement other appropriate interventions to relieve pressure and promote skin integrity. Pinecrest Nursing and its nursing staff also failed to properly treat the pressure ulcer and encourage its healing once it developed.

14

Because Pinecrest Nursing failed to reposition her every two hours and failed to implement effective interventions, Ms. Bailey had sustained pressure on her sacral area, which caused the blood to stop flowing to that part of the body and the skin to distort. Because of the lack of blood flow, the tissue died, causing Ms. Bailey to develop an infected Stage IV pressure ulcer (TR-000002 to TR-000005, TR-000280).

### *How did the severe pressure ulcer in this case impact Ms. Bailey?*

In my opinion, Ms. Bailey's severely infected Stage IV pressure ulcer was a proximate cause of harm and a major contributing factor to her death on 12-4-13. Pressure ulcers have a profound impact on lives: (1) physically, (2) socially, (3) emotionally, and (4) mentally. Pressure ulcers are associated with pain, fluid leakage, smell, discomfort, difficulties with mobility, and a decrease in appetite. Due to the severity of her pressure ulcer, Ms. Bailey was required to endure multiple surgical debridements of her sacral ulcer as well as placement of a wound VAC (TR-000055, TR-000311 to TR-000312, TR-000870). Because Ms. Bailey's sacral pressure ulcer became infected with *Proteus mirabillis* and she developed osteomyelitis, she required aggressive IV antibiotic therapy for treatment of her infections (TR-000311 to TR-000312, TR-000448, TR-000712). Based on the medical records, I am also able to opine that Ms. Bailey's pressure ulcer caused her significant pain (TR-001979 to TR-001980, TR-002636).

### Conclusion

Accordingly, it is my expert opinion that the breaches of the standard of care by Pinecrest Nursing were proximate causes of severe injury and harm to Ms. Bailey. Absent the breaches in the standard of care, to a reasonable degree of medical probability, the patient would not have suffered from a severe Stage IV pressure ulcer, *Proteus mirabillis* wound infection, osteomyelitis, and malnutrition, all of which contributed to her death on 12-4-13 (TR-000055 to TR-000057, TR-000311 to TR-000312, TR-000712). I hold all of the opinions expressed in this report to a reasonable degree of medical certainty.

_____
Christopher Davey, MD

15

# APPENDIX B

# Curriculum Vitae



## Christopher M. Davey, M.D., P.A.
2191 9th Ave. North, Suite 115
Saint Petersburg, FL 33713
**(727) 321-1234 office   (727) 827-2966 fax**
**(727) 641-4501 cell**
**cdavey1@tampabay.rr.com**

Dr. Davey trained as a pathologist at Mount Sinai Medical Center in Miami, Florida but since 1987 has practiced in Family Practice and Geriatric Medicine in office, hospital, and nursing home settings. He has held hospital privileges in Family Practice since 1987 at Edward White Hospital and St. Anthony's Hospital in St. Petersburg, Florida. He is advanced cardiac life support certified He has a special interest in wound diagnosis, prevention and treatment.  He is Board certified by the American Academy of Wound Management as a Certified Wound Specialist (CWS) and is a trained Hyperbaric specialist.  (Hyperbaric medicine is the treatment of severe wounds and other conditions using high pressure oxygen chambers).  He is the Medical Director of Hyperbaric Medicine as well as an active physician at the Edward White Center for Wound Care and Hyperbaric medicine.

Dr. Davey has testified extensively for both plaintiff and defense in cases involving geriatric issues, falls, wounds ("wounds" includes bedsores and pressure ulcers amongst others), complex medical cases and standards of care.  His pathology background gives him the expertise to render opinions on cause of death issues.

## Personal
Date of Birth:                              December 19, 1946
Place of Birth:                            London, England
Fla. Medical License Number:      ME-034037
DEA Number:                             AD8602371
Languages Spoken:                      English, French, and German

## Education

**Medical School**:

1968-1972                                  St. Mary's Hospital, London University,
                                               England
                                               (Now: Imperial College, London)

**Page 1 of 6**

**Internship**:

1972-1973  Northwick Hospital and Research Center
Harrow, Middlesex, England
-Cardiology
-General Surgery

1973-1977  Princess Margaret Hospital, Nassau,
Bahamas (on a British Government Aid
Program)
-Internal Medicine with special interest in
Marine Medicine

**U.S. Residency**:

1977-1980  Mt. Sinai Hospital
Miami, Florida
-Pathology: Anatomical and Clinical

## Professional Experience:

1981-1987  Columbia Edward White Hospital
2323 9th Avenue
Saint Petersburg, Florida 33713
-Emergency Medicine: including
three years as Emergency Room Director

1987-Present  Private Practice
2191 9th Ave. North Ste 115
Saint Petersburg, Florida 33713

-Adult and Geriatric Medicine
-Special Interest in Skin Care and Wound
Care including on staff at the Center for
Wound Care and Hyperbaric Medicine at
Edward White Hospital.

## Hospital Affiliation:
## (Active Medical Staff)
## (Dept of Family Practice):

Columbia Edward White Hospital
2323 9th Avenue
Saint Petersburg, Fl 33713

St. Anthony's Hospital
1200 7th Avenue
Saint Petersburg, Fl 33705

## Board Certification:

Board certified by the American Academy of
Wound Management as a Certified Wound Specialist
(CWS).

## Memberships and Positions Held:

| | |
|---|---|
| 1989-1994: | Member of the Board of Trustees, Columbia Edward White Hospital |
| Previous: | Board Member of the Florida Medical Directors Association |
| Previous: | Medical Director of Sunrise Northshore, Assisted Living Facility and Nursing Home |
| Previous: | Utilization Review and Quality Assurance Committee member at St. Anthony's Hospital |
| Previous: | Member of Florida Medical Directors Association |
| Previous: | Certified Medical Director (AMDA) |

**Page 3 of 6**

| | |
|---|---|
| Present: | Medical Director for Hyperbaric Medicine Center for Wound Care HCA Edward White Hospital |
| Present: | Utilization Review and Quality Assurance Committee member at Columbia Edward White Hospital |
| Present: | Member of American Geriatrics Society and Florida Geriatrics Society |
| Present: | Member of Association for Advancement of Wound Care (national organization) |
| Present: | Member of the Society of University Founders of the University of Miami, Coral Gables, Florida |
| Present: | Member of the Medical/Surgical Care Evaluation Committee at Edward White Hospital |
| Present: | Member of the Infectious Control Committee at Edward White Hospital |
| Present: | Member of the Medical Quality and Education Committee at St. Anthony's Hospital |
| Present: | Member of the Florida Medical Association |

## Publications:

Former Editor and Contributor of "Journal of the Florida Medical Directors Association" (circulation of about 1,000)

Former Co-Editor of "Journal of Florida Geriatrics Society"

**Nursing Home Medical Directorship, Past**
(All dates approximate)

| | |
|---|---|
| Huber Nursing home | 1992-2000 |
| Greenbrook Nursing Home | 1994-1999 |
| Heartland Nursing Home | 1988-1999 |
| Carrington Place Nursing Home | 1995-1997 |
| Coquina Key Nursing & Rehabilitation Center | 2000-2007 |
| St. Pete Health Care Center | 1992-1995 |
| Northshore ALF | 1998-2002 |
| Alpine Nursing Home | 1995-1998 |
| Abbey Nursing Home | 1998-2000 |
| Shore Acres Nursing Home | 1996-1998 |
| Westminster ALF | 2001-2005 |

* CV last updated 8/2011